MELINDA HAAG (CABN 132612)
United States Attorney

BRIAN J. STRETCH (CABN 163973)
Chief, Criminal Division

GARTH HIRE (CABN 187330)
Assistant United States Attorney

   1301 Clay Street, Suite 340-S
   Oakland, California 94612
   Telephone:  (510) 637-3929
   Facsimile:   (510) 637-3724
   E-Mail:     Garth.Hire@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>SAN KWEN SAEPHAN,<br><br>    Defendant, | No. CR 08-0246 CW<br><br>UNITED STATES' SENTENCING MEMORANDUM FOR DEFENDANT SAN KWEN SAEPHAN<br><br>Hearing Date:  August 25, 2010<br>Hearing Time:  2:00 p.m. |

**TABLE OF CONTENTS**

I. INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. FACTS OF DEFENDANT'S CRIMES AND OFFENSE CONDUCT. . . . . . . . . . . . . . . . 1

      A.     Armed Robbery of Massage Parlor in San Rafael. . . . . . . . . . . . . . . . . . . . . . . . 1

      B.     Armed Robbery of Spa in El Cerrito. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      C.     Armed Robbery of Karaoke Club in Hayward.. . . . . . . . . . . . . . . . . . . . . . . . . . 3

      D.     Home Invasion Robbery in Oakland . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III. PROCEDURAL HISTORY.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

IV. SENTENCING GUIDELINES CALCULATIONS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

V. STATUTORY SENTENCING FACTORS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      A.     The Sentencing Guidelines Post-*Booker*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      B.     Consideration of the 3553(a) Factors Call For a Sentence
            of 204 Months. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

           1.     Nature and Circumstances of the Offense and History and Characteristics
                of Defendant.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

                a.     Nature and Circumstances of the Offense. . . . . . . . . . . . . . . . . . . . 9

                b.     History and Characteristics of the Defendant. . . . . . . . . . . . . . . . 9

                    (1)     *Criminal History*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

                    (2)     *Personal History and Characteristics* . . . . . . . . . . . . . . . 10

           2.     Need to Reflect the Seriousness of the Offense.. . . . . . . . . . . . . . . . . . 10

           3.     Deterrence of Criminal Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

           4.     Need to Protect the Public. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

           5.     Need to Provide Defendant with Education.. . . . . . . . . . . . . . . . . . . . . 11

VI. RESTITUTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

VII. CONCLUSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Gall v. United States*, 128 S. Ct. 586 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Kimbrough v. United States*, 128 S.Ct. 558 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Booker*, 543 U.S. 220 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*United States v. Wilson*, 350 F. Supp. 2d 910 (D. Utah 2005) . . . . . . . . . . . . . . . . . . . . . . . . 11

## FEDERAL STATUTES AND RULES

18 U.S.C. §§ 1951(a),924(c)(1)(A)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

18 U.S.C. §§§ 1951(a), 924(c)(1)(A)(i),922(g)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 8

18 U.S.C. § 3553(a),(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

21 U.S.C. § 841(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Federal Rule of Criminal Procedure 11(c)(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

# I.

# INTRODUCTION

Defendant San Kwen Saephan, aka "Forty" ("defendant" or "Saephan"), is a recidivist criminal and a member of an armed robbery crew who has pleaded guilty to committing multiple robberies involving firearms. During the robberies, two of his co-conspirators brandished firearms, defendant brandished a replica firearm, and together they threatened the lives of their victims, and terrorized innocent people. For the reasons set forth below, the government respectfully requests that this Court, after considering the advisory sentencing guidelines and the factors set forth in 18 U.S.C. § 3553(a), sentence defendant to an above-guideline sentence of 204 months' total imprisonment, a five-year term of supervised release (with agreed upon suspicionless search and community service conditions), and a special assessment of $400.

# II.

# FACTS OF DEFENDANT'S CRIMES AND OFFENSE CONDUCT

In the span of about one month in late 2007 and early 2008, defendant engaged in numerous violent armed robberies of small businesses throughout the Bay Area. (PSR ¶¶ 8-15). The victims were robbed at gunpoint, threatened with death, and physically restrained. *Id.* Defendant used a realistic-looking replica firearm while co-conspirator Kao Saeturn (Saeturn) brandished a Glock 17 semi-automatic pistol (the Glock) and co-conspirator Soeung Mouv (Mouv) used a revolver to threaten and intimidate the victims. The facts as set forth below are based on the plea agreement, the PSR, and the police reports and witness statements detailing the crimes which were produced to the defense in redacted form pursuant to a protective order.

### A.    **Armed Robbery of Massage Parlor in San Rafael**

On December 30, 2007, Saephan and co-conspirators Kao Saeturn, Davis Dang (Dang), and Jantar Phun, aka "Kelley" (Phun) were at Phun's uncle's home in Oakland. (PSR ¶ 12). Saeturn declared that he wanted "to jack (rob) someone" because he and others had lost money gambling. *Id.* Saeturn and Saephan left together in a Honda while Dang, Phun, and a third person left in Dang's Lexus, registered to his mother. *Id.* The group proceeded over the San Rafael bridge and then stopped to look at a phone book to find a massage parlor to rob. *Id.* Phun

UNITED STATES' SENTENCING MEMORANDUM
FOR DEFENDANT SAN KWEN SAEPHAN          1

tore a page from the phone book and handed it to Saeturn, who then picked a business to rob. *Id.* The group then traveled to a massage parlor in San Rafael. *Id.* Saeturn directed Dang to accompany him and Saephan into the establishment while Phun and the third individual remained in the Lexus. *Id.* Saeturn carried the Glock while Saephan carried a replica pistol. *Id.* Once inside the business the trio encountered a woman who said she was the only "girl" in the establishment. *Id.* Saeturn pointed the Glock at her and demanded money. *Id.* After taking her purse and a necklace the three left the business and the entire group drove back to Oakland to divide up the robbery proceeds and smoke methamphetamine. *Id.*

### B. Armed Robbery of Spa in El Cerrito

On January 6, 2008, Saeturn, Saephan, Dang, Phun, and others were at a home in Oakland gambling and smoking methamphetamine. (PSR ¶ 13). Saeturn said he wanted to hit up a lick (conduct a robbery). *Id.* Saeturn selected a low-cost professional massage business that he had seen with a "grand opening" sign outside. *Id.* Saephan agreed to participate and proceeded to look for flex-ties to tie people up. *Id.* Dang also offered to go as he had his mother's BMW which was legitimate and could be used as a getaway vehicle. *Id.* Saeturn, Saephan, Dang, Phun, and another female traveled in two vehicles to the business in El Cerrito. *Id.*

Saeturn, Saephan, and Dang went inside the establishment and Saeturn asked how many girls were working. *Id.* Saeturn was told the business offered professional massage services. *Id.* Saeturn then asked about prices and purchased a massage for Saephan and then asked to use the restroom. *Id.* The counter person escorted Saeturn to a bathroom, and then she and a female masseuse went into the business office. *Id.* Immediately, Saeturn kicked opened the office door and pointed the Glock at the women and demanded their money. *Id.* The women handed over all their money. Saephan and Dang went into a massage room, where they encountered a male customer lying face down on a massage table while receiving a massage from a female masseuse. *Id.* Saephan pointed his replica firearm at the man and said, "Motherfucker put your head down!" Saephan then demanded, "Where's the money? Where's the money?" *Id.* The man responded that the money was in his pants which were on a nearby chair. While Saephan used

his replica firearm to intimidate the customer, Dang attempted to bind the man's hands behind his back with duct tape. *Id.* Saeturn eventually ordered that they leave, and the three robbers fled. *Id.* The robbers' entry and exit from the business was captured on surveillance video. *Id.* Saeturn and his co-conspirators took $65 and car keys from the male victim and $500 from the business and the women as well as their car keys, credit cards, and cellular phone. *Id.*

### C. Armed Robbery of Karaoke Club in Hayward

On the evening of January 8, 2008, Saeturn, Saephan, Mouv, aka "Goofy," and the female who was present at the El Cerrito robbery, traveled to a karaoke club in Hayward. (PSR ¶¶ 14-15). Once inside, they rented Room 1, one of eleven private karaoke rooms that the business offered for patrons to sing, laugh, and enjoy themselves while recording their karaoke. Victim JL, twenty-three years-old, was the son of the owner and was working the front desk of the club. There were ten customers inside the business. Inside Room 2 were four young female friends, victims CR (sixteen years-old), JC (nineteen years-old), HH (seventeen years-old), and BH (nineteen years-old). Inside Room 3 were victims EM (a twenty-eight year-old male), JY (a seventeen year-old girl), YC (a seventeen year-old girl), and EY (a sixteen year-old girl). Inside Room 5 were victims RP (a fifty-three year-old man) and KM (a thirty-six year-old woman). According to Hayward Police Department reports and witness statements, what followed was an exercise in pure sadism that terrified the karaoke club's innocent customers, many of whom were teenage girls.

Saeturn and Saephan left Room 1 and proceeded to Room 2 just as two young girls, victims CR and HH, were going to use the restroom. Saeturn told them, "you can't go to the bathroom right now." The two girls ignored him and continued on until either Saeturn or Saephan pulled out his gun and racked a round into the chamber. The girls, fearing for their lives, turned around and ran back into Room 2 and sat on the couch. Meanwhile, the robbers encountered a man, victim RP, who was walking from Room 5 up to the front register to complain that his microphone was not working properly. Either Saeturn or Saephan pointed his gun at the man and told the man to go into Room 2. The man refused and one of the robbers said, "shoot him in his leg." The man then went into Room 2, followed by Saeturn and Saephan.

UNITED STATES' SENTENCING MEMORANDUM
FOR DEFENDANT SAN KWEN SAEPHAN           3

Either Saeturn or Saephan then told the man to get on his knees and put his hands behind his back. They then tied the man's hands behind his back and his ankles together with microphone cord and pointed a gun at his head. They also took $200, truck registration papers, and the man's San Francisco Fire Department badge from his pants pockets. Victim JC remembers either Saeturn or Saephan saying, "pop a cap in that guy." Victim HH remembered Saephan telling Saeturn to "put a cap in him." Saeturn and Saephan took three of the girls' purses and put them on a table in the center of the room. Victim CR asked Saephan for her keys and victims BH and HH remembered him saying, "Shut the fuck up bitch or I'll shoot you." Saeturn and Saephan took victim CR's purse, wallet, money, ipod, and cellphone; they took victim JC's purse, prescription glasses, credit card, car keys, and wallet; and they took victim HH's purse which contained $23, her driver's license, cellphone, and school supplies.

Victim JL was watching the business's television monitors and noticed Saeturn and Saephan, who had rented Room 1, had just walked into Room 2. Knowing that this room was occupied by other customers, and because it was against the business's policy to enter into another customer's room without permission, victim JL started to approach Room 2. As he did so, Mouv came up to him. The co-owner said, "can I help you?" Mouv said, "yeah, get in the room." Mouv then pointed a gun at victim JL's stomach and forced him into Room 1. Mouv told him to lie down and then tied his hands behind his back and his ankles together using microphone cord. Mouv then forcibly went through his pockets and took his cellphone.

After terrorizing the fifty-three year-old man and four teenage girls in Room 2, Saeturn and Saephan proceeded to Room 3 where they encountered victims EM, JY, YC, and EY. Saeturn and Saephan pointed their guns at the man and went through his pockets and took $900, a blank check, four credit cards, a military I.D. card, and a student I.D. card. They then demanded the personal identification number (PIN) for the credit cards. The man, who believed he was going to be shot and killed, gave them the PIN for one of the cards. They also took the cellphone of one of the girls.

Meanwhile, Victim KM had just left Room 5 looking for her male companion (victim RP) and saw Saeturn and Saephan, who had just left Room 3, down the hall. Victim KM asked

Saeturn and Saephan if they had seen victim RP. One of them responded, "oh your white friend, he's in here," and pointed to Room 2. Victim KM began to walk to Room 2 when Saeturn and Saephan grabbed her by her shoulders and waist and tried to force her into Room 6. Victim KM grabbed onto the door frame to prevent them from forcing her into the dark and unoccupied room. Victim KM began to panic as she thought that Saeturn and Saephan were going to rape her. She asked them repeatedly what they wanted but Saeturn and Saephan said nothing. They took her purse off of her shoulder, ripping the strap, and then ran away and out of the business. The next day, victim KM went to the hospital because of pain and an x-ray revealed that her collarbone was broken.

### D. Home Invasion Robbery in Oakland

As part of the conspiracy in this case, on the afternoon of January 11, 2008, Saephan and the female from the El Cerrito robbery went to an apartment on East 16th Street in Oakland where jewelry was informally bought and sold. Inside the apartment were victims RE (a 38 year-old acquaintance of Saephan), victim PY (the 81 year-old mother of RE), and victim PK (a 49 year-old female). After victim RE rebuffed their attempts to sell him gold jewelry they had obtained, Saephan's female companion asked to use the bathroom. (PSR ¶ 68). Victim RE said no. Saephan then told victim RE he had something to tell him and as victim RE moved closer Saephan pulled out his replica firearm and pushed victim RE into the apartment. According to victim PK, Saephan pointed the replica gun at her and said, "you take off your necklace!" Victim PK was scared and Saephan grabbed the charm on the necklace and ripped it from her neck. The necklace broke and Saephan took the charm while the necklace fell into the victim's bra. Saephan pointed the replica gun at victim PK and said, "Don't look at my face! Get down under the table!" At some point, victim RE took a hot clothes iron and hit Saephan in the stomach. Saephan fled with the charm and his replica gun, leaving his female co-conspirator behind. Victim RE grabbed the female robber and held her for police. The female robber scratched and bit victim RE during the struggle. Saephan was arrested on February 7, 2008. Based on the home invasion robbery described above, Saephan pleaded guilty in Alameda County Superior Court to grand theft from a person and was sentenced to a three-year prison term. (PSR ¶ 68).

## III.

## PROCEDURAL HISTORY

On July 16, 2008, a federal grand jury returned a second superseding indictment charging defendant with one count of conspiracy to interfere with commerce by robbery and extortion; three counts of interference with commerce by robbery and extortion; and brandishing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §§ 1951(a) and 924(c)(1)(A)(ii). On December 9, 2009, defendant pleaded guilty pursuant to a plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(C) to one count of conspiracy to interfere with commerce by robbery and extortion; two counts of interference with commerce by robbery and extortion; and one count of using, carrying, and brandishing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §§ 1951(a) and 924(c)(1)(A)(ii). The Court ordered the United States Probation Office (USPO) to prepare a presentence report (PSR). A sentencing hearing is presently scheduled for August 25, 2010. There have been two related sentencings in this case.

First, on August 12, 2009, Soeung Mouv pleaded guilty to conspiracy to interfere with commerce by robbery and extortion; interference with commerce by robbery and extortion; possession with intent to distribute methamphetamine; possession of a firearm in furtherance of a drug trafficking crime; and felon in possession of a firearm in violation of 18 U.S.C. §§ 1951(a), 924(c)(1)(A)(i), 922(g)(1), and 21 U.S.C. § 841(a)(1), stemming from his involvement in the karaoke club robbery and his subsequent arrest with narcotics for sale and a firearm. On October 28, 2009, this Court sentenced Mouv to a total term of imprisonment of 180 months.

Second, on October 28, 2009, Kao Saeturn pleaded guilty to conspiracy to interfere with commerce by robbery and extortion; interference with commerce by robbery and extortion; and brandishing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §§ 1951(a) and 924(c)(1)(A)(ii), based on his participation in the robberies and his role as the organizer/leader of the robbery crew. On August 4, 2010, this Court sentenced Saeturn to a total term of imprisonment of 272 months.

# IV.

# SENTENCING GUIDELINES CALCULATIONS

The parties and the USPO agree that the sentencing guidelines applicable to defendant are as follows:

Conspiracy and Armed Robbery (Counts One and Four)

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2B3.1(a)): | 20 |
| Firearm Brandished (U.S.S.G. § 2B3.1(b)(2)(C)): | + 5 |
| Physical Restraint (U.S.S.G. § 2B3.1(b)(4)(B)): | + 2 |

Conspiracy and Armed Robbery (Counts One and Six)

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2B3.1(a)): | 20 |
| Physical Restraint (U.S.S.G. § 2B3.1(b)(4)(B)): | + 2 |

Using, Carrying, and Brandishing Firearm (Count Seven)

| | |
|---|---|
| (U.S.S.G. § 2K2.4; 18 U.S.C. § 924(c)(1)(A)(ii)): | 7 years |

Combined Offense Level:

| | |
|---|---|
| Highest Offense Level: | 27 |
| Grouping Adjustment (U.S.S.G. § 3D1.4): | + 1 |

Total Combined:                                                                28

| | |
|---|---|
| Acceptance of Responsibility (U.S.S.G. § 3E1.1): | - 3 |

Final Offense Level:                                                           25

After adding 84 consecutive months for the 924(c) conviction, the government and the USPO agree that the applicable advisory guideline range is 168-189 months.

# V.

# STATUTORY SENTENCING FACTORS

**A.    The Sentencing Guidelines Post-*Booker***

In *United States v. Carty*, 520 F.3d 984 (9th Cir. 2008), an *en banc* panel of the United States Court of Appeal for the Ninth Circuit identified a framework for district courts to follow in the wake of *United States v. Booker*, 543 U.S. 220 (2005), and its progeny. The "overarching statutory charge for a district court is to 'impose a sentence sufficient, but not greater than

necessary' to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." *Carty*, 520 F.3d at 991 (quoting 18 U.S.C. §§ 3553(a), (a)(2)).

Sentencing proceedings are to begin by correctly determining the applicable sentencing guidelines range. In *Carty*, the Ninth Circuit acknowledged that "[i]n this sense, the Guidelines are 'the starting point and the initial benchmark'" and are to be kept in mind throughout the process." *Id.* (quoting *Kimbrough v. United States*, 128 S.Ct. 558, 574 (2007)). The district court should then consider the § 3553(a) factors to decide if they support the sentence suggested by the parties. *Id.* The district court may not presume that the sentencing guidelines range is reasonable, nor should the guidelines be given any more or less weight than any other factor. *Id.* The guidelines should, however, be "respectfully considered." *Id.* The district court must of course make an "individualized determination based on the facts." *Id.*

If a district court judge decides that a sentence outside the applicable guideline range is appropriate the judge "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Carty*, 520 F.3d at 991 (*quoting Gall v. United States*, 128 S.Ct. 586, 597 (2007)).[1]

Thus, this Court, having properly calculated the guideline range (which the parties agree is 168-189 months), should then look to the factors set forth by Congress in 18 U.S.C. § 3553(a) to determine a reasonable sentence for defendant. After consideration of the 3553(a) factors, the reasonable and appropriate sentence is clearly one above the advisory guideline range, namely, 204 months imprisonment.

---

[1] On appeal, the Ninth Circuit will review a sentence to determine whether it is reasonable, and only a procedurally erroneous or substantively unreasonable sentence will be set aside. *Carty*, 520 F.3d at 993. Of course, in paragraph 4 of the plea agreement, defendant waived his right to appeal.

UNITED STATES' SENTENCING MEMORANDUM
FOR DEFENDANT SAN KWEN SAEPHAN         8

**B.     Consideration of the 3553(a) Factors Call For a Sentence of 204 Months**

    **1.     Nature and Circumstances of the Offense and History and Characteristics of Defendant**

        **a.     Nature and Circumstances of the Offenses**

The nature and circumstances of the offenses demonstrate the need for a 204-month sentence. As set forth in considerable detail above, defendant was the right hand man to the organizer and leader of an armed robbery crew. During the robberies, defendant's co-conspirators brandished firearms while he brandished a replica firearm. Together, they terrorized their victims, many of whom were young girls. Defendant yelled at and taunted his victims. The robbery crew threatened its victims with death, made them get on their knees while guns (both real and realistic) were pointed at them and rifled through their persons and possessions. Defendant and Saeturn even broke a woman's collarbone. The nature of these crimes was cruel and vicious and yet defendant was an eager and willing participant.

The nature and circumstances of the offenses demonstrate defendant to be a violent and extremely dangerous criminal who shows no respect for human life and who relishes putting the fear of death into his victims. Clearly, the nature and circumstances of the offenses demonstrate that defendant poses, and will continue to pose, a danger to the community unless he is incarcerated for a significant period of time. This conclusion is established not only by the nature and circumstances of the offenses but also by defendant's history and characteristics.

        **b.     History and Characteristics of the Defendant**

            **(1)     *Criminal History***

Defendant's criminal history demonstrates him to be a violent recidivist who is willing to steal, intimidate, threaten, and injure to get what he wants and to feed his devotion to methamphetamine. Specifically, defendant has previously been convicted of burglary (1995), grand theft (1996), assault with a deadly weapon (1997), inflict corporal injury on spouse/co-habitant (2003), vehicle theft (2007), make/pass fictitious check (2007), and grand theft from a person. (PSR ¶¶ 62-68). Throughout his criminal career defendant has demonstrated himself incapable of complying with the law while on release and violated the conditions of his probation

about four times. *Id.* Defendant has also been arrested for burglary, attempted burglary, possession of narcotics or controlled substance, vehicle theft, and receipt of stolen property. (PSR ¶¶ 73-77).

It is therefore not surprising that an Alameda County Probation Report prepared for defendant's most recent conviction states, "Unfortunately, it seems, at this point, the defendant has made no strides toward changing his path." (PSR ¶ 68).

Defendant's extensive criminal history, repeated violations of probation, and willingness to terrorize his victims and risk their lives during the robberies he and his co-conspirators committed all support the 204-month sentence recommended by the government.

### (2) *Personal History and Characteristics*

The details of defendant's personal life also support the requested sentence of 204 months imprisonment. Defendant grew up in a home free of criminality, alcoholism, drug use, and mental illness. (PSR ¶ 80). It was expected that he would, "grow up and do the right thing, raise a family, and get jobs." *Id.* Defendant, however, failed on every count. Defendant has repeatedly chosen to do the wrong thing by committing crime after crime in which he tangibly victimized innocent people. Defendant has never held verifiable employment. (PSR ¶ 91). Instead of raising a family, he destroyed one. Defendant fathered four children that he does not see, does not support, and does not care about. (PSR ¶ 82). He physically traumatized their mother. (PSR ¶¶ 65). These four children (ages 9, 7, 5, and 5) now have no parents in their lives and live with their maternal and paternal grandparents. (PSR ¶ 82). Rather than devote his time and energy to raising happy and healthy children defendant has chosen instead to dedicate his life to violence and methamphetamine. And, until his arrest, defendant showed no signs of stopping and has given every indication that his criminality will escalate. Defendant has embarked on a path of danger and destruction fueled by methamphetamine and 204-month sentence is needed to stop him and protect the community.

### 2.   Need to Reflect the Seriousness of the Offense

The offenses in question, multiple robberies where firearms were brandished and in which young victims were threatened with death, is extremely serious. A sentence of 204

months imprisonment is necessary to reflect the seriousness of defendant's eager participation as the number two man in a violent robbery crew.

### 3. Deterrence of Criminal Conduct

By imposing a 204-month sentence on defendant the Court has the opportunity to have a strong specific and general deterrent effect. First, defendant will be specifically deterred from committing more crimes by knowing that another very lengthy prison term awaits him should he re-offend. Perhaps more importantly, this Court has an opportunity to send a strong signal to others involved in the same milieu of methamphetamine, gambling, and robbery that continuing with that kind of criminal conduct will lead to lengthy terms of federal imprisonment. Through the 204-month sentence requested by the government, this Court can generally deter others from engaging in the same conduct as the defendant and thereby make the East Bay and other surrounding communities a safer place.

### 4. Need to Protect the Public

The public needs to be protected from recidivists, like defendant, who continue to steal, rob, and terrorize. A 204-month sentence of imprisonment will without question protect the public.

### 5. Need to Provide Defendant with Education

The need to provide defendant with education and vocational skills, while important in most contexts, must be placed in a subordinate position to the important considerations of deterrence, protection of the public and the need for the sentence to reflect the seriousness of the offense. *See United States v. Wilson*, 350 F. Supp. 2d 910, 921-22 (D. Utah 2005) (noting that legislative history of Sentencing Reform Act demonstrates that Congress intended to place rehabilitation as a secondary consideration where serious crimes were involved). Defendant will have access to many programs in the prison system to which he can avail himself. Neither the presence nor absence of any further educational programs should weigh heavily in this Court's sentencing determination.

## VI.
## RESTITUTION

The government respectfully requests that the Court order defendant to pay restitution (joint and several with the other defendants in this case) in the following amounts to the following victims. The government will provide the full names of the victims to the USPO.

1. Victim TBC - $500
2. Victim RP - $200
3. Victim EM - $900
4. Victim HH - $23

## VII.
## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court sentence defendant to a total term of 204 months' imprisonment (consisting of 120 months' imprisonment on counts one, four, and six to run concurrently and 84 months' imprisonment on count seven to run consecutively to the terms of imprisonment on the other counts), a three-year term of supervised release (with terms and conditions recommended by the USPO and as agreed to by the defendant) on counts one, four, and six to run concurrently and a five-year term of supervised release (with terms and conditions recommended by the USPO and as agreed to by the defendant) on count seven to run concurrently with the supervised release terms imposed on the other counts, and order defendant to pay a $400 special assessment and $1,623 in restitution as set forth above.

DATED: August 18, 2010               Respectfully submitted,

                                     MELINDA HAAG
                                     United States Attorney

                                       /s/
                                     GARTH HIRE
                                     Assistant United States Attorney